**Howard P. YATES Plaintiff,**

v.

**The HERTZ CORPORATION, Defendant.**

**No. 3:02–0286.**

United States District Court, M.D. Tennessee, Nashville Division.

Sept. 10, 2003.

Morris Reid Estes, Jr., John P. Nefflen, Stewart, Estes & Donnell, Richard Hughes Batson, II, Nashville, TN, for Plaintiff.

Teresa Rider Bult, Constangy, Brooks & Smith, Nashville, TN, Frank Barry Shuster, Constangy, Brooks & Smith, LLC, Atlanta, GA, for Defendant.

### MEMORANDUM

TRAUGER, District Judge.

Pending before the court is defendant The Hertz Corporation's Motion for Summary Judgment (Docket No. 20), to which plaintiff has responded (Docket No. 40), defendant has replied, (Docket No. 45), and plaintiff has filed a sur-reply (Docket No. 49).

### Factual Background and Procedural History

Defendant The Hertz Corporation ("Hertz") is a Delaware corporation with its principal place of business in New Jersey. (Docket No. 11, Amended Complaint at ¶ 2; Docket No. 15, Answer to Plaintiff's Amended Complaint at ¶ 2.) As part of its international operations, Hertz operates a Rent–A–Car business at the Nashville International Airport ("Nashville RAC"). (Docket No. 42, Plaintiff's Response to Defendant's Statement of Undisputed Material Facts at ¶ 1; Docket No. 11 at ¶ 2; Docket No. 15 at ¶ 2.) In July or November of 1997,[1] Hertz hired plaintiff Howard P. Yates as a security guard at the Nashville RAC.[2] (Docket No. 42 at ¶ 3.) Yates was an at-will employee. *Id.*

Hertz has three entrances/exits to its Nashville RAC airport lot. *Id.* at ¶ 2. Yates was primarily stationed as a security guard at the rear gate—an extremely busy gate in continual use by Hertz employees shuttling rental vehicles to other locations and by van drivers transporting shuttle drivers to and from off-site locations. (Docket No. 42 at ¶¶ 2, 8; Docket No. 46, Defendant Hertz's Reply to Plaintiff's Statement of Disputed, Material Facts to Be Presented to the Jury at ¶ 17.) Each entrance/exit is equipped with security precautions in the form of both "tiger teeth" and a "gate arm." (Docket No. 42 at ¶ 2.) When lowered, the gate arm blocks the exit, and the tiger teeth are designed

---

1. There is some confusion between the parties as to the start date of Yates's employment with Hertz. Defendant asserts that Yates was hired as a security guard in July 1997, while Yates states that, based on Defendant's Response to Interrogatories, he believes he was hired in November 1997. (Docket No. 42 at ¶ 3) Both parties agree, however, that plaintiff was employed by Hertz from 1997 until his termination. *Id.* The discrepancy in the start date is not material to the findings of this court.

2. Yates was 73 years old at the time of his hire. (Docket No. 25, Yates Dep. at 8.)

to puncture the tires of vehicles exiting, but not entering, the facility when they are engaged. *Id.* Plaintiff asserts that his main duty at the gate was supposed to be to provide entrance and exit to the shuttle drivers, and to electronically scan their badges and cars. (Docket No. 42 at ¶ 4; Docket No. 25, Notice of Filing of Deposition Transcripts, Deposition of Howard P. Yates at 42–44.) Hertz expected security guards in command of these gates to remain vigilant, stop what they were doing, and perform their duties when cars approached their gates. (Docket No. 46 at ¶ 22.) In addition to guarding the rear gate, Yates's regular duties included control of vehicular and pedestrian traffic in the front of the airport lot during busy times, inspection of vehicles and driver documents of customers mistakenly exiting the airport lot through the rear gate, and prevention of auto theft. *Id.* at ¶¶ 33, 42. At the times when Yates was directing customer traffic, he was removed from his post at the rear gate by Hertz managers. *Id.* at ¶ 39. On occasion, Yates was also removed from his post at the rear gate to drive the courtesy cart, which was used to transport customers and their luggage to rental cars. *Id.* at ¶ 43.

Defendant's written corporate policy, applicable to Hertz's Nashville location, required the use of safety devices and guards on all machines and equipment used by Hertz. (Docket No. 42 at ¶ 5.) However, this policy was not always followed by Nashville RAC management. It is undisputed that, when Yates was removed from his post at the back gate to perform other duties, the unmanned gate was left open and the tiger teeth inactivated to allow cars to exit the airport lot without being scanned, pursuant to managers' instructions. (Docket No. 46 at ¶ 34.) At times when a security guard was not present at the back gate and the gate arm was down, barring exit, van and shuttle drivers would often simply lift the gate

themselves to exit the airport lot, or van drivers would assign shuttle drivers to the rear gate to lift the gate arm, but not scan the cars. (Docket No. 46 at ¶¶ 40, 41.) It is undisputed that, prior to his termination, Yates was instructed by Kelly Graham, a Hertz manager, to raise the security arm at the back gate to allow cars to pass without scanning them in order to expedite turnaround of the cars. *Id.* at ¶ 35. Graham and DeWayne Kirkham, another manager, also instructed other security guards to follow the same practice, which those security guards regularly did. (Docket No. 46 at ¶ 38; Docket No. 41, Notice of Filing Exhibit Nos. 1–13 in Support of Plaintiff's Response to Defendant's Motion for Summary Judgment, Ex. 7, Deposition of Robert Clark at 32–33.) In the three-and-one-half years that Yates worked for Hertz, he was never personally given a written memorandum or letter warning him about leaving his post unattended. (Docket No. 46 at ¶ 44.)

Hertz had a written policy that required that security guards at the Nashville RAC receive a thirty-minute break during each daily eight-hour shift. (Docket No. 42 at ¶ 5; Docket No. 41, Ex. 4, Deposition of Keith DeWayne Kirkham at 41; Docket No. 23, Appendix to Motion for Summary Judgment, Ex. 1 at 55.) However, during plaintiff's employment at Hertz, the defendant never scheduled a daily, uninterrupted thirty-minute break for Yates or any of its security guards at the Nashville RAC (Docket No. 46 at ¶ 5; Docket No. 41, Ex. 4, Kirkham Dep. at 44), nor did it schedule regular restroom breaks or regular meal breaks for its security guards during the period of Yates's employment. (Docket No. 46 at ¶¶ 10, 11.) Security guards were allowed to take breaks only when they could "fit it in." *Id.* at ¶ 12. It is undisputed that, during the entire time that Yates worked for Hertz at Nashville RAC, he never received an uninterrupted thirty-

minute break from his duties. *Id.* at ¶ 9. Hertz did not regularly assign specific employees to relieve its security guards for a daily uninterrupted thirty-minute break at the Nashville RAC during Yates's employment. *Id.* at ¶ 8. Rather, Hertz required security guards to try to find a manager to relieve them from their posts before they could take breaks. *Id.* at ¶ 13.

Kelly Graham, who was the city manager at the Nashville RAC at the time of Yates's termination and directed his discharge, admitted that "operational circumstances" prevented security guards from obtaining relief so that they could take breaks. *Id.* at ¶ 16. Graham testified at his deposition that he considered a security guard to be on break when he was eating lunch, having a Coke, or smoking a cigarette at his post. *Id.* at ¶ 21. Plaintiff himself told Graham that he had trouble getting a manager or van driver to relieve him so he could take a personal break, at which time Graham advised him that the gate should be lowered and the tiger teeth up and a van driver should be asked to relieve him. (Docket No. 46 at ¶ 19; Docket No. 25, Yates Dep. at 93; Docket No. 42 at ¶ 7)[3] Other security guards also spoke with Graham about the difficulty security guards were having in finding relief so that they could take personal breaks. (Docket No. 46 at ¶ 20.) It is undisputed that, if Yates needed to take a restroom break but could find no one to relieve him, managers instructed him to have van drivers cover his post, or just raise the gate and inactivate the tiger teeth so that van and shuttle drivers could exit the airport lot, and then to take a personal break. (Docket No. 42 at ¶ 5; Docket No. 46 at ¶ 45.)

On February 22, 2001, the date of his termination, Yates was scheduled to work from 2:00 p.m. to 10:00 p.m. (Docket No. 46 at ¶ 1.) Yates arrived for work at around 2:00 p.m. that day. *Id.* at ¶ 2. At 4:00 p.m., he needed to use the restroom. (Docket No. 25, Yates Dep. at 111.) He notified the front office three times that he needed to take a break. (Docket No. 46 at ¶ 23.) After requesting relief from a manager once in order to take a break, plaintiff contacted the manager's office a second time, but was told by a manager that they were too busy to relieve him and that he should attempt to have a van driver relieve him. (Docket No. 46 at ¶ 24; Docket No. 25, Yates Dep. at 111.) Yates notified a van driver that he needed a break, but the van driver said that he was too busy and that Yates should wait for another driver. (Docket No. 46 at ¶ 25.) Twenty-five to thirty-five minutes later, Yates asked Sherrard Watson, a van driver who had relieved Yates on a prior occasion, to relieve him and Watson agreed, pulling his van back around as if to stop at Yates's post. (Docket No. 46 at ¶¶ 26–28; Docket No. 25, Yates Dep. at 111–12.) By this time it was approximately 5:30 p.m., three-

---

**3.** Yates testified as follows in his deposition: Kelly Graham came up to me at my post and he said, Howard, what do you do if you have to go to the restroom. And I said, Kelly, what would you do if you have to stand here and go to the restroom. And he said, Howard, I would call the manager. And I said I did. And he said what did she say? I said she said she was busy. They were too busy, to leave the arm up and go ahead. And he said, Howard, I don't want you to leave the arm up, I want you to leave the arm down and the tiger claws up. He said, get a van driver. I said I called the van driver, he came by, he said he was busy. And he said what do you want to do. And I said what do you want me to do, stand here and use the restroom in my pants? And he said, well, turns around and walks off (indicating). I said thanks for the answer.

MR. ESTES [Attorney for the plaintiff]: For the record, Mr. Yates indicated that Mr. Graham had his palms in the air. (Docket No. 25, Yates Dep. at 93.)

and-one-half hours after Yates came on duty and one-and-one-half hours after Yates had first requested relief in order to take a break. (Docket No. 46 at ¶ 3.) Yates then walked from his post to the nearest restroom, which was more than 700 feet away. *Id.* at ¶ 29. When he left his post, Yates left the gate arm up and did not activate the tiger teeth.[4] (Docket No. 42 at ¶ 9.) Yates was absent from his post for less than thirty minutes. (Docket No. 42 at ¶ 4; Docket No. 46 at ¶ 30.)

When Yates returned to his post, he was approached by Jerry Thacker, a manager employed by Hertz. (Docket No. 46 at ¶ 31.) On direct order from Graham, the Hertz city manager at the time, Thacker summarily discharged Yates. *Id.* Yates explained that Watson had agreed to cover his post while he took a break, but Thacker said that it did not matter if Watson had agreed to relieve him; he was still fired. *Id.* at ¶ 32.[5]

On February 20, 2002, the plaintiff filed an action in the Circuit Court of Davidson County, Tennessee, claiming wrongful termination on the basis of retaliatory discharge in violation of public policy. The defendant removed the case to this court on March 22, 2002, pursuant to 28 U.S.C. §§ 1441 and 1446. (Docket No. 1, Notice of Removal.) The plaintiff filed an amended complaint on July 3, 2002 (Docket No. 11, Amended Complaint), which the defen-dant answered on July 18, 2002. (Docket No. 15, Answer to Plaintiff's Amended Complaint.)

### Analysis

#### 1. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1477 (6th Cir. 1989). In determining whether the moving party has met its burden, the court must view the factual evidence and draw reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *McLean v. Ontario, Ltd.,* 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the

---

4. Plaintiff admits that he said the following at his deposition about leaving the security devices inactivated: "What difference does it make if [the gate is] up or down when all somebody has to do is push a button up to raise it. I don't know why [Hertz] is putting such a big emphasis on letting the arm down. That don't make much sense." (Docket No. 42 at ¶ 10.) However, plaintiff asserts that he made the statement to suggest how easy it was to raise the gate because the button was right inside the booth. *Id.*

5. In the months following Yates's termination, the security guards began a unionization ef-fort. (Docket No. 41, Ex. 8, Deposition of Robert Kelly Graham at 60–61.) The effort was prompted by the guards' concerns regarding job security, following the termination of Yates and one other guard, and regarding their dissatisfaction with the slow pace at which complaints about bathroom breaks were addressed by Hertz. *Id.* at 61–62. Hertz staff found some validity to their complaints and implemented changes to address their concerns. *Id.* at 62. Hertz instituted a policy of scheduled breaks in which break times were assigned and security guards were relieved so that breaks could be taken. *Id.*

truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC,* 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). If the nonmoving party, however, fails to make a sufficient showing on an essential element of the case with respect to which the nonmoving party has the burden, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.,* 187 F.3d 533, 537–38 (6th Cir.1999).

To preclude summary judgment, the nonmoving party "is required to present some significant probative evidence that makes it necessary to resolve the parties' differing versions of the dispute at trial." *Gaines v. Runyon,* 107 F.3d 1171, 1174–75 (6th Cir.1997). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Shah v. Racetrac Petroleum Co.,* 338 F.3d 557, 566 (6th Cir.2003) (quoting *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505). The nonmoving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. To determine whether the nonmoving party has raised a genuine issue of material fact, the evidence of the nonmoving party is to be believed and all justifiable inferences drawn in his favor. *Id.* at 255, 106 S.Ct. 2505.

The court should also consider whether the evidence presents "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Amway Distribs. Benefits Ass'n v. Northfield Ins. Co.,* 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505). "There is no genuine issue for trial unless the nonmoving party has produced enough evidence for a jury to be able to return a verdict for that party." *Tinsley v. General Motors Corp.,* 227 F.3d 700, 703 (6th Cir.2000). If the evidence offered by the nonmoving party is "merely colorable," or "is not significantly probative," or enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson,* 477 U.S. at 249–52, 106 S.Ct. 2505. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White,* 190 F.3d 427, 430 (6th Cir.1999) (citations omitted).

## 2. *Prima Facie Case*

Tennessee courts recognize the common law tort of retaliatory discharge. The Tennessee Supreme Court has articulated four elements that an employee who has been terminated must show to make out the common law tort of retaliatory discharge: "(1) that an employment-at-will relationship existed; (2) that the employee was discharged; (3) that the reason for the discharge was that the employee attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and (4) that a substantial factor in the employer's decision to discharge the employee was the employee's exercise of protected rights or compliance with clear public policy." *Crews v. Buckman Laboratories Int'l, Inc.,* 78 S.W.3d 852, 862 (Tenn.2002). *See also Guy v. Mutual of Omaha Ins. Co.,* 79 S.W.3d 528, 535 (Tenn.2002); *Mason v. Seaton,* 942 S.W.2d 470, 474 (Tenn.1997); *Stein v. Davidson Hotel Co.,* 945 S.W.2d 714, 717 (Tenn.1997); *Hodges v. S.C. Toof & Co.,* 833 S.W.2d 896, 899 (Tenn.1992); *Chism v. Mid–South Milling Co.,* 762 S.W.2d 552,

556 (Tenn.1988); *Clanton v. Cain–Sloan Co.*, 677 S.W.2d 441, 444–45 (Tenn.1984).

■ Tennessee law has long endorsed the employment-at-will doctrine, which provides for employers or employees to terminate their relationship without breach of contract given "good cause, bad cause, or no cause." *Crews*, 78 S.W.3d at 857. *See also Clanton*, 677 S.W.2d at 443 (Tenn. 1984); *Payne v. Western & Atl. R.R.*, 81 Tenn. 507, 519–20 (Tenn.1884), *overruled on other grounds by Hutton v. Watters*, 132 Tenn. 527, 179 S.W. 134, 138 (1915). The policies behind the at-will doctrine are that employers should be free to make business judgments without interference from the courts, *see Mason*, 942 S.W.2d at 474, and employees should be able to quit working for a person or company and be able to exercise their rights just as employers may. *See Crews*, 78 S.W.3d at 858 (citing *Payne*, 81 Tenn. at 518–19). Despite a general adherence to the at-will employment doctrine, the Tennessee legislature and courts have carved out some restrictions on the right of an employer to terminate an employee, usually for reasons of well-defined public policy. *See Chism*, 762 S.W.2d at 555.[6]

The Tennessee Supreme Court in *Clanton* first established a public policy exception to the at-will employment doctrine, recognizing a cause of action in tort for retaliatory discharge, in cases where such an action was necessarily implied by the state's workers' compensation laws. The purpose of the exception was to effectuate the duty of the employer under statute, secure the statutory rights of the employ-

ee, and carry out the intention of the legislature. *Clanton*, 677 S.W.2d at 445. In its most recent articulation of the basis for such a claim, the Tennessee Supreme Court has said that an at-will employee "generally may not be discharged for attempting to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy which is evidenced by an unambiguous constitutional, statutory, or regulatory provision." *Crews*, 78 S.W.3d at 858 (quoting *Stein*, 945 S.W.2d at 716–17). The Court thereby framed the cause of action for retaliatory discharge as recognizing that "in limited circumstances, certain well-defined unambiguous principles of public policy confer upon employees implicit rights which must not be circumscribed or chilled by the potential of termination." *Stein*, 945 S.W.2d at 717. The Court has cautioned that the exceptions to the employment-at-will doctrine should be "narrowly applied" and not permitted to consume or eliminate the general rule. *Id.* at 717 n. 3. *See also Chism*, 762 S.W.2d at 556.

Regarding the plaintiff's prima facie case, there is no dispute between the parties as to the first two elements of the common law claim for retaliatory discharge. Both plaintiff and defendant agree that there was an at-will employment relationship between them at the time of Yates's termination. (Docket No. 42 at ¶ 3.) The parties also agree that Yates was discharged on February 22, 2001, although the cause of the termination is disputed. *Id.* at ¶ 12.

---

6. For instance, as noted in *Chism*, there are statutory restrictions on the employer's right to terminate an employee for serving on a jury, Tenn.Code Ann. § 22–4–108(f), and restrictions on an employer's employment or termination of a person for discriminatory reasons based on race, creed, color, religion, sex, age, or national origin, Tenn.Code Ann. § 4–21–401(a), or handicap, Tenn.Code Ann.

§ 8–50–103. *Chism*, 762 S.W.2d at 555. Tennessee has also enacted the Public Protection Act of 1990, commonly known as the "whistleblower" statute, which provides that "no employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities." Tenn.Code Ann. § 50–1–304(a) (Supp.2002).

### 3. *The Public Policy Exception*

The key dispute between the parties relates to the third element of the cause of action: whether or not the reason for the discharge was that Yates attempted to exercise a statutory or constitutional right, or for any other reason that violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision. *Crews,* 78 S.W.3d at 862. Because the Tennessee Supreme Court, both in *Crews* and in earlier case law, has framed the third element of a claim for retaliatory discharge in the disjunctive, *see id.; Stein,* 945 S.W.2d at 717, Yates need only establish one of these components to make out his prima facie case.

■ Although he asserts that his discharge was a violation of clearly defined public policy (Docket No. 40, Plaintiff's Response to Defendant's Motion for Summary Judgment at 17), the plaintiff argues most forcefully that he was discharged for attempting to exercise his statutory right to a thirty-minute rest break under Tenn. Code Ann. § 50–2–103(d). Tenn.Code Ann. § 50–2–103(d) provides, in relevant part:

> Each employee must have a thirty (30) minute unpaid rest break or meal period if scheduled to work six (6) hours consecutively, except in workplace environments that by their nature of business provide for ample opportunity to rest or take an appropriate break. Such break shall not be scheduled during or before the first hour of scheduled work activity. Tenn.Code Ann. § 50–2–103(d) (1999 & Supp.2002).

As defendant notes, the crucial question is whether the Tennessee Supreme Court's interpretation of "statutory or constitutional right" in the retaliatory discharge con-text can sustain plaintiff's claim based on the exercise of a right of this type.

The Tennessee Supreme Court has not addressed the precise issue of whether or not a terminated employee may base a claim for retaliatory discharge on his exercise of the statutory right to an unpaid rest break or meal period under Tenn. Code Ann. § 50–2–103(d). Defendant argues that a cause of action based on the exercise of a statutory right has only been allowed in Tennessee in the context of workers' compensation retaliation claims and interprets *Clanton* to require that a statute must have a specific, statutory expression of employer liability before it can provide a statutory right on which a retaliatory discharge claim might be based. (Docket No. 45, Defendant Hertz's Reply in Support of Motion for Summary Judgment at 6.) Defendant further distinguishes workers' compensation retaliation claims from the plaintiff's alleged exercise of his statutory right by arguing that workers' compensation claims require an affirmative step by a plaintiff (i.e., the verifiable filing of a claim) plus a definitive point at which the employer has knowledge of the exercise of the right. *Id.* at 7.

Defendant relies entirely on *Clanton* for its assertion that a statute must have what the defendant describes as a "specific statutory expression of employer liability" before it can provide a statutory right upon which a retaliatory discharge claim might be based.[7] But the *Clanton* decision, read most plainly, yields the opposite interpretation. There need not be a specific, statutory expression of employer liability to sustain a cause of action for retaliatory discharge. ("[A] cause of action for retaliatory discharge, although not explicitly

---

**7.** Defendant reasons that "it seems clear from *Clanton v. Cain–Sloan* [sic], 677 S.W.2d 441 (1984) and its progeny that such a statute must have a specific statutory expression of employer liability," but does not identify the progeny to which it refers. (Docket No. 45 at 6.)

created by the [workers' compensation] statute, is necessary to enforce the duty of the employer, to secure the rights of the employee, and to carry out the intention of the legislature." *Clanton,* 677 S.W.2d at 445.) Moreover, the statute that plaintiff cites as the basis for his claim *does* have a provision for employer liability, in the form of criminal and civil penalties set forth at Tenn.Code Ann. § 50–2–103(h)[8] (although it does not include an explicit provision of employer liability for retaliatory discharge). Defendant's argument is based on an unwarranted reading of *Clanton.*

Defendant further argues that plaintiff's exercise of his statutory right to a break is not analogous to the workers' compensation retaliation cases because it does not involve the affirmative step of filing a claim. However here, the request twice made to management to be afforded the right to take a break, and then the physical act of taking such a break, are analogous to the filing of a claim in the workers' compensation context. The plaintiff sufficiently asserted his statutory rights.

Defendant next broadly argues that the plaintiff's claim must fail as a matter of law because a cause of action for retaliatory discharge resting on the exercise of a statutory right has only been allowed in Tennessee in the context of workers' compensation retaliation claims. While nothing in the definition of the tort or its elements so limits its application (indeed, the language of the elements suggests a much broader application), further analysis is warranted on the question of whether a retaliatory discharge claim based on the exercise of the statutory right to an unpaid rest break can lie.

To determine whether or not the Tennessee Supreme Court's interpretation of the statutory right in the retaliatory discharge context allows for plaintiff's claim, it is instructive to return to that court's initial articulation of the public policy exception in *Clanton.* In *Clanton,* the Court considered whether an employee-at-will who was discharged because she filed a claim for workers' compensation, in violation of the defendant employer's implied condition against filing such claims, could assert a cause of action for retaliatory discharge, notwithstanding the state's long endorsement of at-will employment. *Id.* at 442. The workers' compensation laws did not explicitly create a cause of action for retaliatory discharge, but the Court implied one. *Id.* at 445. The Court reasoned that the laws reflected a careful balancing of the employer's duty to compensate and the employee's right to receive compensation, and that to allow an employer to discharge an employee for attempting to exercise his right would be to circumvent the statute and to relieve the employer of his obligation to fulfill his duty. *Id.* The Court relied on the reasoning of a leading case from Indiana to guide its recognition of this public policy exception to at-will employment: " '[T]he employee must be able to exercise his right in an unfettered fashion without being subject to reprisal. If employers are permitted to penalize employees for filing workmen's compensation claims, a most important public policy would be undermined. The fear of being discharged would have a deleterious effect on the exercise of a statutory right.... The end

---

**8.** Tenn.Code Ann. § 50–2–103(h) states, in relevant part: "A violation of this section is a Class B misdemeanor, punishable by a fine of not less than one hundred dollars ($100) nor more than five hundred dollars ($500). Further, every employer, partnership or corporation willfully violating any provision contained in subsections (a)-(g) is subject to a civil penalty of not less than five hundred dollars ($500) nor more than one thousand dollars ($1000) at the discretion of the commissioner, or the commissioner's designated representative." Tenn.Code Ann. § 50–2–103(h) (Supp.2002).

result, of course, is that the employer is effectively relieved of his obligation.'" *Id.* at 443 (quoting *Frampton v. Cent. Ind. Gas Co.,* 260 Ind. 249, 297 N.E.2d 425, 427 (1973)). Thus, *Clanton* stands for the proposition that a retaliatory discharge claim can lie when to do otherwise would be to penalize the employee for his exercise of a statutory right and to relieve the employer of his obligation to provide for the exercise of the right.

In a later case, holding that an employee discharged for his service on a jury could seek remedies both under a statute barring termination for jury service and under the common law tort of retaliatory discharge, the Tennessee Supreme Court clarified its position on the source of the public policy exception at common law in an instructive way: "Importantly, *Clanton* is not limited to retaliatory discharge actions arising from an employee's exercise of workers' compensation rights, but rather makes the tort action of retaliatory discharge available to employees discharged as a consequence of an employer's violation of a clearly expressed statutory policy." *Hodges,* 833 S.W.2d at 899. This articulation of the public policy exception suggests that an exercise of rights established under a clearly expressed statutory policy other than the workers' compensation laws can serve as a basis for a retaliatory discharge claim.

While Tennessee case law is scant, several courts interpreting Tennessee law, including this court, have relied on other state court cases that have upheld retaliatory discharge claims based on the exercise of a statutory or constitutional right outside the workers' compensation context. *See, e.g., Bloom v. Gen. Elec. Supply Co.,* 702 F.Supp. 1364, 1366 (M.D.Tenn.1988) (citing *Montalvo v. Zamora,* 7 Cal.App.3d 69, 86 Cal.Rptr. 401 (Cal.Ct.App.1970), where the plaintiffs' discharge for their exercise of the statutory right to designate a representative to negotiate terms of employment was found to constitute wrongful discharge); *Williams v. Tenn. In–Home Health Servs., Inc.,* No. 84–369–II, 1985 Tenn.App. LEXIS 2838, at *5 (Tenn.Ct. App. Apr. 26, 1985) (also citing *Montalvo* ). Other Tennessee courts have entertained plaintiffs' assertions of statutory or constitutional rights as the basis for a retaliatory discharge claim but struck down their claims on other grounds. *See, e.g., Rigsby v. Murray Ohio Mfg. Co.,* No. 01–A–01–9012–CV–00457, 1991 WL 95710, at *2 (Tenn.Ct.App.1991) (striking down plaintiff's claim of retaliatory discharge in violation of his First Amendment rights by saying that the "right to exercise first amendment privileges is not absolute" and noting that plaintiff was not terminated for "exercising his rights under a state statute").

The Colorado Supreme Court has been presented with an issue somewhat similar to that raised in this case—whether an employee terminated for exercising her job-related right to take a break can state a cognizable claim for wrongful discharge in violation of public policy. *Crawford Rehabilitation Servs., Inc. v. Weissman,* 938 P.2d 540, 552 (Colo.1997) (en banc). The plaintiff had been discharged from her position as a clerical typist following a dispute with her employer regarding the number of rest breaks she was entitled to take. *Id.* at 543. During the dispute, she had contacted the Division of Labor of the Department of Labor and Employment for clarification on the regulatory policy. *Id.* The plaintiff argued that she had been wrongfully discharged, both for exercising her purported *statutory* right to contact the Division of Labor and for exercising her right to ten-minute rest periods for each four hours worked, as provided under a minimum wage *regulation* promulgated by the Division of Labor. *Id.* at 552–53. The court found plaintiff's use of the *stat-*

*ute* to be factually inapplicable to the case; therefore, it did not reach the question of whether a right under that *statute* could be the basis of a wrongful discharge claim. *Id.* at 552 n. 16. The court further found that the plaintiff's interest in taking ten-minute breaks, as provided by the administrative *regulation*, did not rise to the level of public policy. *Id.* at 553. "Administrative regulations may be sources of public policy in limited circumstances, but those circumstances are not present here." *Id.* "Not all potential sources of public policy are of sufficient gravity to outweigh the precepts of at-will employment," the court continued, stressing that the legislature is the branch of government that discerns what is public policy, and the courts' role is merely to *recognize and enforce those poli-cies. Id.*

Tennessee courts have also stressed their limited role in articulating public policy in retaliatory discharge actions; they will not engage in the "legislative function" of establishing public policy or seek to discern public policy from the common law. *See Stein*, 945 S.W.2d at 717; *Watson v. Cleveland Chair Co.*, 789 S.W.2d 538, 540, 544 (Tenn.1989) (citing *Cavender v. Hewitt*, 145 Tenn. 471, 239 S.W. 767, 768 (1922) in *Smith v. Gore*, 728 S.W.2d 738, 747 (Tenn.1987) for the proposition that "All questions of policy are for the determination of the legislature, not the courts."). In this case, however, plaintiff does not rely on a regulatory policy implemented by an administrative agency. Rather, Yates grounds his claim on the exercise of a right that has the imprimatur of the Tennessee legislature, having been memorialized in a statute, Tenn.Code Ann. § 50–2–103(d). Plaintiff does not ask the court to articulate public policy but merely to enforce it, as it has been established by the legislature. In this way, the plaintiff is in an analogous position to the plaintiff in *Clanton*. Plaintiff had a statutory right to an unpaid thirty-minute rest break or meal period for each six hours worked. Defendant had a statutory obligation to provide such breaks. Just as in *Clanton*, to refuse to allow the plaintiff to lodge a retaliatory discharge claim based on his exercise of this statutory right would be to relieve the defendant employer of its obligation to provide one. The plaintiff has established that his retaliatory discharge claim is a valid one under the law.

Defendant asserts that plaintiff was discharged for leaving his post without engaging the security devices of the gate arm and tiger teeth. (Docket No. 21, Defendant's Memorandum In Support of Summary Judgment at 11.) Plaintiff admits that he left his post to take a break without activating the security devices and admits that there is a written corporate policy requiring use of the devices. However, it is undisputed that Nashville RAC did not consistently follow that protocol. Defendant terminated plaintiff immediately after he returned from his break.

■ Plaintiff has met his burden for purposes of this motion in establishing that he was terminated for taking his statutorily-mandated break. The break that Yates took on the day of his termination was his statutorily-mandated break under Tenn. Code Ann. § 50–2–103(d). He was scheduled to work more than six consecutive hours. He had already worked more than one hour of his eight-hour shift (in fact, two) when he sought to take a break at approximately 4:00 p.m., as the statute requires. It is undisputed that, although Hertz had a written policy requiring thirty-minute breaks for their security guards, guards were never scheduled to take such breaks, were not given relief that would have allowed them to take such breaks, and were discouraged from taking breaks by management, who considered a guard having a Coke or smoking a cigarette at his post to be "on break."

Plaintiff has established that Hertz management was aware that guards, and Yates specifically, had trouble getting relief and that Yates had that trouble on the day that he was terminated. Yates was terminated immediately upon returning from his break. Yates was instructed by managers to leave the gate arm open and tiger teeth inactivated to allow cars to exit the airport lot without being scanned when he was removed from his post to perform other duties. Several Hertz managers instructed him and other security guards to disengage the security devices to allow cars to pass without scanning them for quicker turnaround during busy times. Plaintiff has established that there is a genuine issue of material fact on the question of whether or not Yates was discharged for exercising his statutory right to an unpaid rest break.

Because the court finds that the third element of a claim for retaliatory discharge requires plaintiff to show only one of two components, and that plaintiff has established sufficient facts to pose a genuine issue of material fact as to the first, the court will only briefly address defendant's arguments regarding the second component.

■ Defendant asserts that it is entitled to summary judgment because the statute that the plaintiff cites as the source of his claim is an ambiguous one and does not yield a clearly-defined, unambiguous expression of public policy, as is required by case law. (Docket No. 21 at 6.) Defendant asserts that the very existence in the statute of the "nature of business exception," which does not require breaks for employees whose jobs "by their nature of business provide for ample opportunity to rest or take an appropriate break," Tenn.Code Ann. § 50–2–103(d), and the ambiguity in application of this exception, reflect the lack of a clearly-defined public policy underlying the statute. (Docket No. 21 at 6.) Defendant asserts that, because two governmental bodies (the Attorney General of Tennessee in a 1994 opinion,[9] and the Division of Labor Standards of the Tennessee Department of Labor in a 1995 regulation[10]) have formally interpreted the statute and the nature of business exception, it must be ambiguous. *Id.* at 7. This argument is without merit, as the defendant's

---

**9.** In this opinion interpreting the nature of business exception for employers seeking to fall within it, the Attorney General stated that whether a workplace environment provides an "ample opportunity to rest or take an appropriate break" is a fact-specific determination to be made on a case-by-case basis. Op. Tenn. Att'y Gen. No. 94–060, 1994 WL 150730 (1994). The Attorney General suggested a number of factors to consider in determining whether a workplace environment fits into the exception, including whether employees are free to leave the employer's premises, whether there is a locker room or lounge provided for employees, whether employees are to be engaged in substantial duties for the employer during the time in question, and others. *Id.* In a footnote, the defendant makes a half-hearted argument that Yates's workplace environment fits within the nature of business exception. (Docket No. 21 at 7 n. 7.) Application of the factors to Yates's

situation clearly shows that it does not fit within the exception.

**10.** Defendant misstates the language of the Department of Labor regulation when it quotes the rule as stating "businesses that by their nature of employment provide for sufficient opportunity to rest or take an *approximate* break shall not be affected, such as waiter and waitresses in the employment of restaurants." (Docket No. 21 at 6, emphasis added by defendant) Defendant has relied on, and provided to the court as Exhibit 4 of its Appendix to Motion for Summary Judgment, a copy of the *proposed* rules, dated September 29, 1994. (Docket No. 23, Appendix to Motion for Summary Judgment, Ex. 4) The *final* rules, effective January 27, 1995, use the same language as the statute itself—"appropriate break" not "approximate break." Tenn. Comp. R. & Regs. 0800–5–2–.04 (1999).

approach would render any statute that has been interpreted ambiguous.

Defendant also argues that plaintiff's discharge occurred subsequent to a bathroom break, not an unpaid rest break or meal period as provided for by Tenn.Code Ann. § 50–2–103(d). (Docket No. 21 at 7.) While other states have mandated 10–15 minute bathroom breaks, defendant argues, Tennessee has enacted no such constitutional, statutory, or regulatory provision (notwithstanding Tenn.Code Ann. § 50–2–103(d)) that would suggest that there is legislative intent or a clear and unambiguous policy favoring bathroom breaks in Tennessee law. *Id.* at 8. The court is not convinced by this argument. Plaintiff's use of his statutorily-mandated thirty-minute rest break, or any portion thereof, to visit the restroom does not abrogate his right to the break. The court similarly finds no merit in defendant's argument that plaintiff's alleged misstatement of the statute terms, as requiring an "uninterrupted" thirty-minute break, shows that there is no clear public policy underlying the statute because "unpaid rest break or meal period" is subject to varying interpretations about how that break must be taken. *Id.* at 8. Such a misstatement does not establish ambiguity in the legislature's endorsement of a public policy favoring regular rest breaks or meal periods for employees in continuous work.

### 4. *Causation*

The parties also dispute whether the plaintiff is able to present facts sufficient to carry his burden of proof on the fourth element of retaliatory discharge, causation. The fourth element requires that a substantial factor in the employer's decision to discharge was the employee's exercise of protected rights or compliance with clear public policy. *Crews,* 78 S.W.3d at 862. *See also Anderson v. Standard Register Co.,* 857 S.W.2d 555, 558 (Tenn.1993); *Chism,* 762 S.W.2d at 556. In establishing

the elements of a claim for retaliatory discharge in the workers' compensation context, the Tennessee Supreme Court first surveyed the three levels of causation that other state courts had variously adopted before it chose the least burdensome of the three— substantial factor test. *Anderson,* 857 S.W.2d at 558. This test requires proof only that the filing of the workers' compensation claim, or in this case the exercise of a statutory right, constituted an important or significant motivating factor for the discharge. *Id.* In *Guy v. Mutual of Omaha Insurance Co.,* 79 S.W.3d 528 (Tenn.2002), the Court contrasted the relatively light burden of the substantial factor test with the heavier burden of proof required under the Public Protection Act of 1990, commonly known as the whistleblower statute. The latter legislation requires the plaintiff to show that his whistleblowing behavior was the *sole* reason for his termination, instead of merely a substantial factor. *See Guy,* 79 S.W.3d at 537.

A plaintiff may meet the causation requirement by presenting direct evidence of a causal link, such as where the employer acted according to an established policy or admitted the reason for termination, or by presenting compelling circumstantial evidence. *See Austin v. Shelby Cty. Gov't,* 3 S.W.3d 474, 480–81 (Tenn.Ct.App.1999) (citing *Thomason v. Better–Bilt Aluminum Prods., Inc.,* 831 S.W.2d 291, 293 (Tenn.Ct.App.1992)).

If a plaintiff is able to provide sufficient direct or circumstantial evidence to allow the inference of a causal link between the exercise of protected rights or compliance with clear public policy and his discharge, the employer has the burden of showing a legitimate, non-pretextual reason for the employee's discharge. *See Mason,* 942 S.W.2d at 473 (citing *Anderson,* 857 S.W.2d at 559). *See also*

*Robinson v. Nissan Motor Manufacturing Corp.,* No. M1999–00296–COA–R3–CV, 2000 WL 320677, at *5 (Tenn.Ct.App. Mar. 29, 2000). If the employer presents a legitimate, non-pretextual reason for the discharge, the burden shifts back to the employee to prove that the employer's explanation is pretextual or not worthy of belief. *See Smith v. Bridgestone/Firestone, Inc.,* 2 S.W.3d 197, 200 (Tenn.Ct. App.1999); *Robinson,* 2000 WL 320677, at *6. Essentially, causation does not exist if the employer's stated basis for the discharge is valid and non-pretextual. *See Bates v. Cooper Indus., Inc.,* 957 F.Supp. 125, 127 (M.D.Tenn.1997); *Robinson,* 2000 WL 320677, at *5.

Defendant argues that Yates is unable to make out a prima facie case of retaliatory discharge because he is unable to establish that his exercise of a statutory right to a break was a substantial factor in the termination decision. (Docket No. 21 at 10.) Defendant's argument is largely based on its fact-based dispute of plaintiff's proposed reason for his termination, rather than on an argument that the law will not allow plaintiff to make out his claim as he has stated it. *Id.* at 11.

Defendant also argues, however, that the substantial factor element cannot be established, and an employer cannot be held to have based its decision to terminate on an employee's exercise of rights when the employer did not know the employee was exercising such rights at the time the decision was made. (Docket No. 21 at 11; Docket No. 45 at 4.) Defendant relies on *Fenton v. HiSAN, Inc.,* 174 F.3d 827, 831 (6th Cir.1999), and *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 121

S.Ct. 1508, 149 L.Ed.2d 509 (2001) for this proposition. (Docket No. 45 at 4.) Defendant's reliance on both of these cases is misplaced.[11]

■ Defendant has admitted facts concerning the length of Yates's shift on the day of his termination and the times at which he sought relief to take a break and finally did take a break that establish that he had a statutory right to a break on the day he was terminated. Defendant has admitted that it had a policy of not scheduling breaks for its security guards and that plaintiff never received a thirty-minute uninterrupted break during his employment for Hertz. It is undisputed that security guards, including. Yates, were allowed to take breaks when they could "fit it in," but were not provided with relief so that they could leave their busy posts to do so. Defendant admits that Hertz management, including Kelly Graham, were aware that guards had trouble getting relief in order to take breaks in general. It is undisputed that, on the day of his termination, Yates twice spoke with the manager's office in an attempt to get a relief for a break. It is undisputed that Mr. Yates was terminated immediately upon returning from his break.

■ Temporal proximity alone will not establish causation between the exercise of a right and discharge. *See Nguyen v. City of Cleveland,* 229 F.3d 559, 566 (6th Cir. 2000) (discussing and reaffirming two of the court's earlier decisions in which it had rejected the proposition that temporal proximity alone is enough to establish a causal connection); *Conatser v. Clarksville*

11. The *Fenton* court considered a claim of retaliation under Ohio state law (which itself is based on federal law), *see Fenton,* 174 F.3d at 828–29, not a claim of retaliatory discharge under Tennessee law, and the defendant has not identified any Tennessee case law that would require the plaintiff to make the same

showing as under a retaliation claim. Similarly, the *Breeden* court considered a retaliation claim under Title VII of the Civil Rights Act of 1964, *see Breeden,* 532 U.S. at 269, 121 S.Ct. 1508, not a retaliatory discharge claim under Tennessee common law, and the requirements of each claim are distinct.

*Coca–Cola Bottling Co.,* 920 S.W.2d 646, 648 (Tenn.1995) ("proximity in time without evidence of satisfactory job performance does not make a prima facie case"); *Austin,* 3 S.W.3d at 481 ("plaintiff cannot meet this burden, however, merely by showing that the plaintiffs participation in protected activity was followed by a discharge from employment, even where the proximity in time between the two events is very short"). However, compelling circumstantial evidence will satisfy that burden. *See Mason,* 942 S.W.2d at 474 (crediting the plaintiff's circumstantial evidence of her own good work history to support her claim of causation when the employer had offered no explanation for her discharge); *Austin,* 3 S.W.3d at 480–81 (stating that a plaintiff can show causation by providing direct evidence or compelling circumstantial evidence). Here, the immediate temporal proximity of the exercise of Yates's statutory right to his discharge is undisputed, and there is compelling circumstantial evidence of Hertz's refusal to provide such breaks. Viewing the evidence in the light most favorable to the plaintiff, and drawing all reasonable inferences in favor of the plaintiff, this court finds that a reasonable factfinder could return a verdict for the plaintiff. Plaintiff has established that there is a dispute as to a genuine issue of material fact with regard to the fourth element.

■ Because the plaintiff has established facts sufficient to meet his prima facie burden on causation, the burden shifts to Hertz to present a legitimate, non-pretextual reason for his discharge. Hertz asserts that it terminated Yates because he left his post without activating the security arm and the tiger teeth. (Docket No. 21 at 11). Plaintiff admits that he left his security guard post to take a break without putting the gate arm down or activating the tiger teeth. He also admits that there is a written corporate policy requiring the use of security devices on all equipment, though he disputes whether or not Nashville RAC followed that protocol. Defendant terminated plaintiff immediately after he returned from his break, which he took without activating the security measures. These facts are sufficient to establish Hertz's legitimate, non-pretextual reason for Yates's discharge.

The defendant having established a legitimate reason for plaintiff's discharge, plaintiff must produce evidence sufficient to present an issue for the jury that the defendant's reason is pretextual. Relying on Sixth Circuit precedent in federal employment discrimination claims, defendant argues that, to prove pretext, the plaintiff may not rely on his prima facie case but must produce additional evidence of discrimination that "overwhelms" the defendant's non-discriminatory reason for termination. (Docket No. 45 at 5.) While Tennessee courts have adopted the general burden-shifting framework that has its roots in federal employment discrimination cases to analyze common law retaliatory discharge causation issues, the Tennessee Supreme Court has not specifically endorsed in this context the federal articulation of what the plaintiff must show to make out pretext. Lower Tennessee courts and federal courts applying Tennessee law in this area are not entirely consistent on how closely they will adhere to the federal standard in analyzing pretext. Some have asserted that the plaintiff must present "specific admissible facts, which realistically challenge the defendant's stated reasons" in order to make out pretext on a retaliatory discharge claim. *See Wooley v. Madison County, Tennessee,* 209 F.Supp.2d 836, 845 (W.D.Tenn.2002) (quoting *Hill v. Perrigo of Tenn.,* No. M2000–02452–COA–R3CV, 2001 WL 694479, at *6 (Tenn.Ct.App. June 21, 2001)); *Robinson,* 2000 WL 320677, at *6. "Conclusory statements of the employee do not establish proof of pretext," nor does

an employee's " 'subjective interpretation of [the employer's] actions ... create an issue of fact sufficient to defeat a properly supported summary judgment motion.' " *Hubrig v. Lockheed Martin Energy Sys., Inc.,* No. 03A01–9711–CV–00525, 1998 WL 240128, at *8 (Tenn.Ct.App. Oct. 12, 1998) (quoting *DeVore v. Deloitte & Touche,* No. 01A01–9602–CH–00073, 1998 WL 68985 (Tenn.Ct.App. Feb. 20, 1998)). Even those courts that track closely the federal standard in analyzing state common law claims acknowledge that, to establish pretext, the plaintiff must only make out facts that are sufficient to permit, not mandate, the finder of fact to find pretext. *See Smith,* 2 S.W.3d at 204.

■ Yates has asserted specific admissible facts that could realistically challenge defendant's stated reasons and establish that the defendant's reason for terminating Yates was pretextual. In addition to the evidence regarding the immediate temporal proximity of Yates's exercise of his statutory right to his discharge and the compelling circumstantial evidence of defendant's refusal to provide breaks for security guards, including Yates, plaintiff has produced evidence that defendant's policy concerning the use of security devices was inconsistently asserted and enforced. Yates has shown that he was often removed from his post to perform other duties and that at these times, under managers' instructions, the unmanned gate arm was often left open and the tiger teeth inactivated to allow cars to exit the airport lot without being scanned. Plaintiff asserts Kelly Graham instructed him to raise the security arm at the back gate to allow cars to pass without scanning them in order to expedite turnaround of the cars and that Graham and DeWayne Kirkham, another manager, also instructed other security guards to do the same. Yates has established that in the three-and-one-half years that Yates worked for Hertz, he was never personally given a written memo or letter warning him about leaving his post unattended. These facts are sufficient under the standard articulated above to pose a genuine issue of material fact as to whether defendant's legitimate reason for discharging Yates was pretextual.

### 5. *Civil or Criminal Liability*

■ Defendant argues further that the plaintiff's claim must fail as a matter of law because he cannot show what the defendant claims to be an additional critical element for the common law retaliatory discharge claim—"the employee must have *personal* exposure to civil or criminal liability when they exercise their statutory right." (Docket No. 21 at 5.) The defendant claims that this element arose under the *Chism* court's articulation of a retaliatory discharge claim, and cites *Reynolds v. Ozark Motor Lines, Inc.,* 887 S.W.2d 822, 824 (Tenn.1994), and *Moore v. Averitt Express, Inc.,* No. M2001–02502–COA–R3–CV, 2002 WL 31302947 (Tenn.Ct.App. Oct. 11, 2002), to support the existence of the element. In arguing for this additional element, the defendant ignores the express language of the *Chism* court: "The present case is not suitable for undertaking to define the limits of the tort of retaliatory discharge." *Chism,* 762 S.W.2d at 556. The *Chism* court only discusses the plaintiff's personal exposure to civil or criminal sanctions in the context of analyzing the similarities between the particular factual situation in *Chism* and comparable factual situations in other state cases. *Id.* The Court draws a distinction between those decisions, where "usually the employee's personal exposure to civil or criminal sanctions was emphasized," and the issue in *Chism,* where no exposure to such sanctions were alleged. *Id.* But the Court does not mandate that personal exposure to civil or criminal sanctions is a requirement for retaliatory discharge claims.

Further, defendant's reliance on *Reynolds* and *Moore* is unavailing. Those cases, and the *Chism* case, involved a situation where an employee was discharged for refusing to acquiesce in or keep silent about an employer's illegal activities. In such cases, examination of plaintiff's exposure to civil or criminal sanctions is appropriate. But it is not appropriate in cases regarding the exercise of a statutory right. Defendant does not cite any cases of workers' compensation retaliation claims for the proposition that plaintiff's exposure to civil or criminal sanctions is a required element. Defendant also fails to address the Tennessee Supreme Court's explicit enunciation of the four required elements for a retaliatory discharge claim in violation of public policy that appears in *Crews*, which does not discuss such a fifth element at all. *Crews*, 78 S.W.3d at 862. This court is unconvinced that the plaintiff is required to make out personal exposure to civil or criminal sanctions as an element of his prima facie case of retaliatory discharge.

### Conclusion

For the reasons stated herein, the defendant's Motion for Summary Judgment (Docket No. 20) will be denied.

An appropriate order will enter.

### ORDER

For the reasons expressed in the accompanying memorandum, the Motion for Summary Judgment filed by defendant The Hertz Corporation (Docket No. 20) is DENIED.

It is so ordered.